UNITED STATES of America,
Plaintiff-Appellee,

v.

Ramon David GOMEZ,
Defendant-Appellant.

No. 80–1322.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 7, 1980.

Decided Mar. 20, 1981.

John Robinson, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Lawrence Campbell, San Diego, Cal., for defendant-appellant.

Before WALLACE and ALARCON, Circuit Judges, and COPPLE,* District Judge.

WALLACE, Circuit Judge:

In a non-jury trial with stipulated facts, Gomez was convicted of bank robbery in violation of 18 U.S.C. § 2113(a). He appeals, asserting that denial of his motion to suppress his confession and certain physical evidence was reversible error. We disagree and affirm.

I

According to the confession, on the morning of January 24, 1980, Gomez parked in front of a business and apartment building near an office of the California First Bank in San Diego. He secreted a gray three-piece leisure suit in a gym bag with a razor, shaving cream, and false mustache in the second floor hallway of the building. He then went to the bank wearing blue jeans, tennis shoes, a sweatshirt, and a baseball cap. He approached the teller and handed her a demand note that stated that he had a gun. The teller gave him money which he placed in a zipper pouch. He then ran through parking lots to the building in

* Honorable William P. Copple, United States District Judge, District of Arizona, sitting by designation.

which he had left his gym bag. In an area of the second floor where he would be unobserved, he changed into the leisure suit, shaved off the stubble of a mustache, and put on the false mustache. He left the clothing he had worn in the hallway area and walked down the stairs toward his car. At that point he encountered a San Diego police officer.

Officer Roger Warburton had approximately eight years' experience with the San Diego Police Department. He was assigned to the Crime Suppression Unit. As part of his duty he conducted identification of suspects using an "identi-kit." He used the kit to convert the verbal description of a witness into a picture of a suspect using transparent overlays of various facial features. He had made approximately 175 such composite drawings from verbal descriptions. While on duty on January 24, 1980, he received a radio call that there had been an armed bank robbery at the California First Bank. He was then about two blocks away checking a burglar alarm. The radio transmission described the suspect as a Filipino male, 5 feet 10 inches tall, very thin, curly black hair, clean shaven, wearing blue jeans, a blue and white baseball cap, and sunglasses.

Officer Warburton began a search of the immediate area. In the course of that search he entered the alcove of a two-story building with a business below and apartments above. He checked the mailboxes in the alcove for Filipino or Hispanic names, believing that witnesses frequently describe Hispanic people as Filipino and vice versa. As he was checking the mailboxes, approximately four or five minutes after the broadcast of the bank robbery, Gomez came down the stairs. Officer Warburton identified himself as a San Diego police officer and asked Gomez whether he had seen anyone running up or down the stairs. Gomez responded that he had encountered no one on the stairs. Officer Warburton asked whether the second floor units were apartments or businesses. Gomez responded that he had been visiting his investment counselor on the second floor. Officer Warburton suspected that this response was untruthful,

because the names on the mailboxes appeared to be the names of individuals rather than businesses. At this time Officer Warburton also examined Gomez more closely, noting not only facial features that might be identified as Filipino by some witnesses, but also what appeared to be a false mustache.

Officer Warburton informed Gomez that he was investigating a bank robbery and that Gomez generally fit the description of the robber. Warburton indicated that he wanted to talk further with Gomez. Officer Warburton accompanied Gomez toward Gomez' car, during which time he used his walkie-talkie to request a more complete description of the robber. Gomez entered his car, and produced his driver's license for identification. Gomez was seated in his car with the doors closed, but the window open. The keys were in the car. Officer Warburton engaged Gomez in small talk while awaiting further description of the robber. During this period Officer Warburton observed that Gomez was beginning to perspire heavily, although it was a cool day, that he was making nervous motions, and that a corner of his false mustache was beginning to peel off. Officer Warburton then requested additional police coverage. When Gomez made a quick hand movement toward the power window console, Warburton blocked the window with his walkie-talkie and ordered Gomez out of the car. As Gomez was walking towards the front of his car, he saw additional police arriving at the scene. Gomez placed his hands on the hood of his car. It is disputed whether this action was in response to a request to do so. Officer St. John then arrived, and patted Gomez down. Officer St. John felt a bulge in Gomez' left breast pocket. At this point Gomez said "Oh, ____, you've got it all now." St. John removed the zipper pouch from Gomez' pocket, and placed Gomez under arrest. The zipper pouch contained the exact amount of money stolen from the bank as well as "bait" twenty dollar bills whose serial numbers had been recorded by the bank. The total elapsed time from the initial contact between Officer Warburton

and Gomez until the time that Gomez was arrested and handcuffed was approximately two and one-half to three minutes.

## II

Gomez, in seeking the suppression of the zipper pouch, its contents, and his subsequent confession, cites *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 73 L.Ed. 1879 (1949). Gomez argues that the *Brinegar* standard governs legitimacy of the police conduct in this case. *Brinegar*, however, was a probable cause case. We need not reach the question of probable cause, because we conclude that the contact between Gomez and the police, up to and including the pat down, is governed by the reasonable suspicion standard of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

It is not clear from the record that Gomez had been stopped or detained by Officer Warburton prior to Warburton's ordering Gomez out of his car. Even if Gomez was in detention after the initial questioning in the alcove, however, the contact remains well within the limits of a *Terry* stop. The Supreme Court elaborated on *Terry* in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), as follows:

> In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." [*citing Terry, supra*, 392 U.S. at 22, 88 S.Ct. at 1880]. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information,

may be most reasonable in light of the facts known to the officer at the time. *Id.* at 145–46, 92 S.Ct. at 1922–23.

The stop of Gomez, if a stop occurred at all, lasted no more than three minutes and focused on his identity and maintaining the status quo pending the receipt of a more detailed description of the bank robber.

In *United States v. Moore*, 638 F.2d 1171 (9th Cir. 1980), we upheld a stop and detention awaiting the arrival of Customs officers. The suspects had flown from Mexico to an airport not designated for customs inspection, thereby arousing a reasonable suspicion that they were smugglers. The detention in *Moore* appears to have been of considerably longer duration than the detention of Gomez.

Gomez relies upon *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (*Dunaway*), and *United States v. Chamberlin*, 609 F.2d 1318 (9th Cir. 1979) (amended, 644 F.2d 1262, 1980) (*Chamberlin*). In *Dunaway*, "the detention of [the suspect] was in important respects indistinguishable from a traditional arrest. [He] was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room." *Dunaway, supra*, 442 U.S. at 212, 99 S.Ct. at 2256. This degree of custody was held to go beyond a *Terry* stop and therefore to require probable cause rather than *Terry's* balancing approach based on reasonable suspicion. Although not denominated an arrest by the police, Dunaway's detention was very nearly as intrusive as an arrest. "[A]ny 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id.* at 213, 99 S.Ct. at 2257. By contrast, the intrusions in the *Terry* case "fell far short of the kind of intrusion associated with an arrest." *Id.* at 212. We conclude that the brief questioning of Gomez, his being ordered out of his car, and his being frisked, are a great distance from the intrusion associated with an arrest.

As we observed in *United States v. Perez-Esparza*, 609 F.2d 1284, 1287 n.2 (9th Cir. 1979), a less intrusive questioning of Dunaway could have been carried out at the neighbor's house at which Dunaway was found. The police arbitrarily and without justification subjected Dunaway to an intrusion considerably greater than necessary. In the present case it is hard to see how the intrusion could have been any less intrusive—compatible with the society's interest in law enforcement and protecting the lives of its police officers and others nearby. The police conduct in *Dunaway* was not reasonable under the circumstances; by contrast, the conduct of officers Warburton and St. John was of "the essence of good police work." *Adams v. Williams, supra,* 407 U.S. at 145, 92 S.Ct. at 1922.

In *Chamberlin,* we concluded that the initial investigatory stop of Chamberlin, based on his suspicious behavior, was justified under *Terry. Chamberlin, supra,* at 126. Subsequently, however, the police detained Chamberlin in a police car for 20 minutes while they investigated whether any crime had been committed and traced down evidence. *Id.,* at 1264. It is important to emphasize the following aspects of Chamberlin's treatment. First, he was removed from the place where he was stopped. Second, he was held and transported in a police car. Third, there was no showing that these actions were justified by any danger to the officers, the public, or the suspect or by any need to bring the suspect together with specialized officers. Instead, the officers were simply holding the suspect in the hope that the investigation they were pursuing might turn up something. This unjustified transportation and detention was too nearly the equivalent of an arrest. Because these elements were not present in the contact between the police officers and Gomez, we conclude that *Chamberlin* does not govern the present case.

The Supreme Court found a justified *Terry* stop where an otherwise innocent appearing van was stopped because it returned past Border Patrol officers on an infrequently used road with timing compatible with a turn-around at a point the officers suspected might be used that night for a pick up of aliens crossing the border illegally. *United States v. Cortez,* —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In the present case Officer Warburton was confronted by a man meeting the general description of the perpetrator of a bank robbery committed two blocks away and five minutes before. He was wearing a false mustache, and giving an apparently false account of where he had just been. This is easily sufficient to satisfy the standard enunciated by the Court in *Cortez*: "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* at ——, 101 S.Ct. at 695.

AFFIRMED.