**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Edward D. PATTERSON, Richard L. Flintoff, Jimmie R. Oglesby, and Gregory C. Martinson, Defendants-Appellants.**

Nos. 79–1368 to 79–1371.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 1981.

Decided June 15, 1981.

David L. Shorett, Chambers, Marston, Hodgins, Shorett, Young & Gillingham, Seattle, Wash., argued, for Patterson.

Kelly P. Corr, Seattle, Wash., argued, for Oglesby.

Katrina C. Pflaumer, Seattle, Wash., argued, for Martinson.

Richard B. Jones, Asst. U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Before WRIGHT, POOLE and NORRIS, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

The appellants were convicted of narcotics offenses. Patterson, Flintoff, and Martinson, who were tried by a jury, contend that some jurors were prejudiced and that the court erred in several respects. Oglesby, who was tried by the court, challenges its refusal to suppress evidence taken from him after he was stopped by federal agents.

## I. FACTS

Flintoff, accompanied by Shevalier [1] and informant Wood, met undercover agents of the Drug Enforcement Administration (DEA) in Tacoma and arranged to sell them cocaine and heroin. The agents paid Shevalier for the drugs at the residence of Gus-

1. Shevalier pleaded guilty to one count of a seven count indictment and agreed to assist the prosecution. He does not appeal.

tafson[2] and Patterson. Flintoff and Shevalier then went with the agents to a residence on South 104th Street, allegedly Martinson's,[3] to pick up the drugs.

Flintoff and Shevalier got out of the agents' car at the 104th Street residence and told the agents to drive around. According to Shevalier, Martinson then left the residence and returned with cocaine, which he sold to Shevalier. When the agents returned, Shevalier delivered the cocaine. He later sold them a sample of heroin.

Flintoff told the agents he could sell them more cocaine and heroin. In a second transaction, DEA agents followed Flintoff's van to Gustafson and Patterson's residence, where Shevalier got out. Flintoff and Patterson then went to the 104th Street residence and returned with drugs, which Gustafson and Shevalier sold to the agents.

Negotiations continued. Informant Wood reported that Martinson was the source of the cocaine, and Shevalier indicated to agents that his source of heroin was Flintoff. Finally, in December 1978, a larger transaction was arranged.

Agents met Shevalier at a restaurant. After he gave them a photograph of cocaine for sale and accepted partial payment, they arrested him. Shortly thereafter, agents spotted Gustafson's van and arrested its occupants, Gustafson and Patterson. In the van the agents found a scale and a package of lactose, but no drugs.

Other agents were searching Gustafson and Patterson's residence pursuant to a warrant when Oglesby and Martinson arrived in Oglesby's brown station wagon. An automobile of similar appearance had been seen earlier at the 104th Street residence, but Oglesby was not known to the agents. Martinson entered the residence and was arrested.

Oglesby remained in the driver's seat with the motor running. Before they knew Martinson had been arrested, two agents converged on the car. Agent Rowe drove his car to block Oglesby's, and Agent Fitzgerald ordered Oglesby to turn off the motor and get out with his hands in sight.

As he emerged, Oglesby spontaneously told the agents that there was a gun under the front seat. Asked whether there was anything else in the car, he said that there was marijuana and cocaine. After this exchange he was advised of his rights and consented to a search of the car, pointing out various items of evidence.

In March 1979, Patterson was acquitted by a jury of charges arising from an alleged sale of phencyclidine (PCP) to DEA agents. The next day, in the same court, Patterson, Flintoff, and Martinson were tried before a jury in the present case for conspiracy to distribute cocaine and heroin, possession of cocaine with intent to distribute, and distribution of cocaine and heroin, in violation of 21 U.S.C. §§ 841 and 846. The jury found them guilty on all seven counts.[4]

Oglesby was charged only in connection with the cocaine sales and waived the right to a jury trial. The cocaine distribution charges against him were dismissed by the court, but he was convicted of conspiracy to distribute cocaine and possession of cocaine with intent to distribute.[5]

Patterson, Flintoff, and Martinson assert that six jurors were prejudiced by knowledge of the previous day's charges against Patterson, and they challenge the court's refusal to instruct the jury on informant credibility. Flintoff and Martinson, who chose not to testify, also challenge the court's refusal to instruct the jury on the right to remain silent.

2. Gustafson, who was sentenced to probation for his role in these events, does not appeal.

3. Martinson contested the allegation that the residence was his. An agent who later searched the residence testified that he noticed mail there addressed to Martinson.

4. Patterson and Martinson received concurrent sentences of five years' imprisonment and five years' special parole for each offense. Flintoff received concurrent sentences of four years' imprisonment and three years' special parole.

5. Oglesby received concurrent sentences of three years' imprisonment and three years' special parole.

Oglesby contends that the court erred in refusing to suppress the evidence taken from him by the DEA agents on the ground that they lacked probable cause or founded suspicion.

## II. OVERLAPPING JURY VENIRES

Patterson asserts, and the United States does not deny, that half the prospective jurors in the instant case (CR 79–2T) were members of the venire in his trial on other narcotics charges (CR 79–1T) the previous day. It appears that six members of the first panel became actual jurors in this case, three having been removed from the first panel by peremptory challenge.[6]

Patterson contends that he was unconstitutionally denied an impartial jury, and Flintoff and Martinson contend that they were also affected. Patterson observes that evidence of his prior arrest and indictment on narcotics charges would not have been admissible as direct evidence of his guilt, see Fed.R.Evid. 404(b), and he argues that disclosure of his prior arrest and indictment to six jurors through overlapping venires was prejudicial.

In *Leonard v. United States*, 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964) (per curiam), the Supreme Court reversed the defendant's conviction because a previous guilty verdict on a similar charge had been returned against him in the presence of the panel from which jurors were selected to try the second charge. *Id.* at 544, 84 S.Ct. at 1696. The Supreme Court found the procedure "plainly erroneous." *Id.*[7] *See*

also *Donovan v. Davis*, 558 F.2d 201, 202 (4th Cir. 1977) (same persons should not have served as jurors in separate trials of defendant); *accord, Virgin Islands v. Parrott*, 551 F.2d 553, 554 (3d Cir. 1977).

When jurors have participated in the defendant's prior conviction, or his past guilt has been conclusively established in their presence, prejudice may be inevitable. But we believe that overlapping venires otherwise require reversal only if (1) the specific circumstances suggest a significant risk of prejudice and (2) examination or admonition of the jurors fails to negate that inference. *Compare, e. g., United States v. Meeker*, 558 F.2d 387, 388 (7th Cir. 1977) (prosecutor's repeated implication of past bad acts through leading questions is likely to be prejudicial despite the judge's admonitions), *with United States v. Splain*, 545 F.2d 1131, 1133 (8th Cir. 1976) (witness's isolated, "innocuous" reference to past bad acts is unlikely to be prejudicial; when evidence of guilt is "overwhelming," conviction should be affirmed).

The circumstances here suggest a significant risk of prejudice. The alleged offenses were similar and the trials only one day apart. Although Patterson was acquitted in the first trial, there is no indication that the jurors knew this. *See Marrero v. Florida*, 343 So.2d 883, 884 (Fla.App.1977) ("a jury is bound to be unfairly prejudiced against the accused by reason of the knowledge of his arrest for another crime").[8]

The United States maintains that the court conducted a "vigorous" examination

---

**6.** Counsel for Patterson and Martinson apparently anticipated overlapping jury venires and informed the court of their concern prior to the first trial. But the court denied Patterson's motion to move one of his trials from Tacoma to Seattle.

At the trial in the instant case, the court denied a motion to remove for cause the six jurors who were present the previous day. The court also refused to permit individual voir dire examination on possible prejudice, and it denied motions for severance, mistrial, and a new trial.

**7.** This circuit had noted that the jurors who sat on the panel were not asked about possible prejudice from the prior exposure and affirmed

the second conviction, finding it supported it by "strong and convincing evidence." *Leonard v. United States*, 324 F.2d 914, 915 (9th Cir. 1963), *rev'd*, 378 U.S. 544, 545, 84 S.Ct. 1696, 1696, 12 L.Ed.2d 1028 (1964) (per curiam).

The Supreme Court's decision in *Leonard* indicates that strong and convincing evidence of guilt will not save a guilty verdict returned by a prejudiced jury.

**8.** *See also Marshall v. United States*, 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) (per curiam) (jurors were exposed to newspaper article about defendant's prior convictions; information prejudicial because "not tempered by protective procedures").

of the jury, negating any inference of prejudice. But the trial transcript does not support this contention. There was no examination specifically targeted on the previous day's experience.

Addressing the jurors and alternates as a group, the court asked: "Does anyone . . . know any of the defendants? . . . [D]o any of you know anything about this case . . . ? Has anyone at any time talked to you as individuals, all fourteen of you, about either [*sic*] of the individual defendants or all of them together, anything, has anybody mentioned anything to you about either individual defendants or all of them combined? I see no hands, so I assume none."

It is not at all clear whether the jurors who were present the day before understood these questions to refer to that experience. The court asked whether any jurors "knew" any of the defendants or knew anything about "this case" and whether anyone had talked to "all fourteen" jurors and alternates "as individuals" about the defendants. A negative answer would not necessarily mean that a juror did not remember the prior indictment. Failure to ask questions of individual jurors, coupled with refusal to permit such questions by counsel, casts further doubt on the procedure.

■ The trial court does have broad discretion to determine the scope of voir dire, *United States v. Chenaur*, 552 F.2d 294, 302 (9th Cir. 1977), and may take the lead in examining the jury for prejudice. *United States v. Baldwin*, 607 F.2d 1295, 1297 (9th Cir. 1979). But if "the trial judge so limits the scope of voir dire that the procedure used for testing does not create any reasonable assurances that prejudice would be discovered if present, he commits reversible error." *Id.* at 1298.

■ We conclude that the examination here was inadequate. The court was apparently trying to avoid tainting the jury through questions that conveyed information the jurors did not already have. In so doing, it failed to ask questions sufficiently specific in scope and direction to provide "any reasonable assurances that prejudice would be discovered if present." *Id.*[9]

■ Although the risk of prejudice is perhaps clearest in Patterson's case, we believe that Flintoff and Martinson are also likely to have suffered prejudice. They were charged as Patterson's coconspirators. We may infer under the facts of this case that juror prejudice against a defendant recently charged with the unlawful sale of narcotics would carry over to such persons closely associated with him in the jurors' minds.[10]

Because the circumstances indicate a significant risk of prejudice and examination of the jurors failed to negate that inference, the convictions of Patterson, Flintoff, and Martinson must be reversed.

## III. FAILURE TO GIVE INSTRUCTIONS

Martinson's proposed instructions on the credibility of informants [11] and on the right to remain silent [12] were rejected by the trial

---

9. A trial judge should be able to ask questions to detect prejudice without creating it. If this is impossible, jurors likely to be prejudiced must be excused.

10. The jurors saw Patterson and Martinson handcuffed together. This literal nexus between the two defendants enhanced the risk that prejudice against Patterson would affect Martinson.

11. The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness.

The jury must determine whether the informer's testimony has been affected by interest, or by prejudice against the defendant.
Transcript, 3/30/79, 434. *See Devitt & Blackmar* § 17.02.

12. Every defendant in a criminal case has the absolute right not to testify. You must not draw any inference of guilt against the defendant because he did not testify.
Transcript, 3/30/79, 429. *See Criminal Jury Instructions for the District of Columbia* § 2.26 (3d ed. 1978).
The court initially indicated that it would give this instruction but apparently changed its mind after closing arguments.

court. Although we need not reach these issues to decide the appeal, we must say, to avoid such error upon retrial, that both instructions should have been given.[13]

### A. Informant and Accomplice Credibility

■ Failure to give an informant or accomplice credibility instruction requires reversal when the informant or accomplice's testimony is " 'important' to the case," i. e., it supplies the only strong evidence of guilt. See Guam v. Dela Rosa, 644 F.2d 1257 at 1260 (9th Cir. 1981) (per curiam).[14]

Wood clearly was an informant. Shevalier was an accomplice, and he was also an informant because he provide[d] evidence against a defendant for some personal advantage . . . ." Id. at 1259. Martinson was seen coming and going, but the case against him relied primarily on the testimony of Wood and Shevalier. The instruction should have been given. See id. 1260.[15]

### B. The Right to Remain Silent

■ Flintoff and Martinson chose not to testify, and Martinson proposed an instruction explaining the right not to testify. Although Flintoff opposed the instruction, Martinson clearly was entitled to have it given. 18 U.S.C. § 3481; see Carter v. Kentucky, — U.S. —, —, 101 S.Ct.

1112, 1121–22, 67 L.Ed.2d 241 (1981); Lakeside v. Oregon, 435 U.S. 333, 338 n.7, 98 S.Ct. 1091, 1094 n.7, 55 L.Ed.2d 319 (1978); Bruno v. United States, 308 U.S. 287, 293, 60 S.Ct. 198, 200, 84 L.Ed. 257 (1939).

■ The United States apparently concedes that failure to give such an instruction is reversible error. It contends that the trial court met the requirement by informing the jury during the impanelling process of the defendants' right to remain silent. But such preliminary admonition is no substitute for the required instruction which must be given with others as the jury prepares to deliberate.[16]

### IV. OGLESBY'S DETENTION

The agents conceded that they lacked probable cause to arrest Oglesby when they first encountered him. The United States maintains that they had "founded suspicion" for an investigatory stop,[17] which ripened into probable cause for an arrest when the gun was discovered.

Oglesby contends that he was under arrest when the agents blocked his car and ordered him out, and that all evidence seized thereafter should be suppressed. He also contends that, even if he was not under arrest, there was no basis for an investigatory stop.

---

**13.** Because this error is manifest and serious, we have commented on it. Our lack of comment on other assertions of error by Patterson, Flintoff, and Martinson implies no approval or disapproval.

**14.** See also United States v. Bernard, 625 F.2d 854, 857 (9th Cir. 1980) (refusal to give accomplice credibility instruction required reversal).

**15.** The court did tell the jury to assess the credibility of witnesses. The United States relies on United States v. Hoyos, 573 F.2d 1111 (9th Cir. 1978), for the proposition that a general instruction to this effect can be an acceptable substitute for the informant credibility instruction. But in Hoyos, the court determined that the witness in question was not an "informant" because he was a salaried agent. Id. at 1116. The court added in dictum that even if the witness was an informant, there was no prejudice. Id.
 Guam v. Dela Rosa, 644 F.2d 1257 (9th Cir. 1981) (per curiam), the more recent case, reaffirms the rule that failure to give a specific

informant or accomplice instruction is reversible when the informant or accomplice's testimony is important. At 1260.

**16.** We note also that the court told the jury: "[Y]ou do not have to take the witness stand and testify against yourself." Transcript, 3/29/79, at 11 (emphasis added). The instruction quoted in note 12, supra, is preferable, for it does not suggest that the defendant's testimony would establish his guilt. We need not consider, however, whether the language used would require reversal had it been used at the appropriate time.

**17.** See generally United States v. Cortez, — U.S. —, —, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); Adams v. Williams, 407 U.S. 143, 146–49, 92 S.Ct. 1921, 1923–25, 32 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–78, 20 L.Ed.2d 889 (1968).

## A. Stop or Arrest?

▉ If the defendant was arrested without probable cause, there is no need to determine whether an investigatory stop would have been justified. *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974); *see United States v. Ramos-Zaragosa*, 516 F.2d 141, 144 (9th Cir. 1975).

▉ Whether an arrest has occurred "depends on all of the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop." *United States v. Harrington*, 636 F.2d 1182, 1186 (9th Cir. 1981) (citation omitted). The question is whether, under all of the circumstances, "a reasonable person would conclude he was under arrest." *Id.*

▉ Among the considerations in determining whether an arrest has occurred, duration of detention is critically important. *See Dunaway v. New York*, 442 U.S. 200, 206–16, 99 S.Ct. 2248, 2253–58, 60 L.Ed.2d 824 (1979); *United States v. Chamberlin*, 644 F.2d 1262 at 1266 (9th Cir. 1980) (detention in police car for 20 minutes following a reasonable stop held improper). If, under the circumstances, an innocent person would reasonably expect to be released after brief questioning, we are less likely to find an arrest. *See United States v. Harrington*, 636 F.2d at 1186.

In *United States v. Johnson*, 626 F.2d 753 (9th Cir. 1980), we suggested a different emphasis. We stated that a "primary" consideration in determining whether an arrest has occurred is "whether or not the defendant was free to choose between terminating or continuing the encounter with law enforcement officers." *Id.* at 755 (citations omitted). We concluded that the defendant was arrested when he answered a knock at the door of his home and confronted agents with guns drawn who took him into custody. *Id.* at 755–56.

In *United States v. Strickler*, we placed great weight on the fact that the defendant was not free to leave. 490 F.2d at 380. Strickler, like Oglesby, had been observed in an automobile near a home under surveillance in a drug investigation. *Id.* at 379. We concluded that the defendant was arrested at the outset of his encounter with the police because "[t]he restriction of Strickler's 'liberty of movement' was complete when he was encircled by police and confronted with official orders made at gunpoint." *Id.* at 380.[18]

Relying on *Strickler*, we held in *United States v. Beck*, 598 F.2d 497 (9th Cir. 1979), that an arrest occurred when nine agents stopped a taxi carrying three suspects, even though, as in the present case, the agents had not drawn their guns. *Id.* at 500–01.

▉ Oglesby contends that the *Strickler* line of cases forecloses any complete restriction of liberty, even for a short time, without probable cause. We disagree. Although our treatment of the issue has not been entirely free of ambiguity, Oglesby's position is contrary to our many decisions upholding stops that involve brief but complete restrictions of personal liberty and would defeat the purpose of the investigatory stop.[19]

In *Strickler*, we indicated that the force used may have been excessive under the circumstances. *See* 490 F.2d at 380. In

---

**18.** Our reasoning in *Strickler* has been challenged. *See* 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* 29 (1978).

> To conclude that the officers' conduct must be viewed as an arrest from the outset because the defendant's restriction of liberty of movement was then complete . . . is to create a test which would cast doubt upon most stops. The typical stopping for investigation cannot be viewed as anything but a complete restriction on liberty of movement for a time
> . . . .

*Id.* at 29 (footnote omitted).

**19.** The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape . . . . [I]t may be the essence of good police work to adopt an intermediate response.

*Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

*United States v. Ramos-Zaragosa,* we again found that an arrest had occurred, but emphasized that the agents had pointed their guns at the suspects "under circumstances not suggesting fears for their personal safety." 516 F.2d at 144.

▆▆▆ Proscription of excessive force is merely the corollary to our holding that an "officer attempting to make an investigatory detention may properly display some force when it becomes apparent that an individual will not otherwise comply with his request to stop." *United States v. Thompson,* 558 F.2d 522, 524 (9th Cir. 1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978). *Accord, United States v. Moore,* 638 F.2d 1171, 1174 (9th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *United States v. Richards,* 500 F.2d 1025, 1028 (9th Cir. 1974), *cert. denied,* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975).[20] In such cases, the person stopped clearly is not free to go. *See United States v. Moore,* 638 F.2d at 1174.[21]

In *Beck,* we acknowledged that "a suspicious individual may be briefly stopped *and detained* for the purposes of limited inquiry and weapons frisk, . . . or 'to maintain the status quo momentarily while obtaining more information' . . . ." 598 F.2d at 500 (emphasis added) (quoting *Adams v. Williams,* 407 U.S. at 146, 92 S.Ct. at 1923; also citing *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)).

We observed that the officers had followed the suspects for several days, essentially on a hunch, and had stopped them

despite having failed to find any evidence of wrongdoing. 598 F.2d at 502. The stop was designed not to freeze the status quo, but to yield evidence of wrongdoing, resembling the detention for custodial interrogation held to be an arrest in *Dunaway v. New York. See* 442 U.S. at 206–16, 99 S.Ct. at 2253–58. Similarly, despite the broad language of *United States v. Johnson,* the initial detention in that case was clearly a prelude to custodial interrogation. *See* 626 F.2d at 754–56.[22]

▆▆▆ A valid stop is not transformed into an arrest merely because law enforcement agents momentarily restrict a person's freedom of movement. They may impose such a restriction to maintain the status quo while making an initial inquiry, provided the force displayed is not excessive under the circumstances. *See United States v. Gomez,* 642 F.2d 1124, 1126–27 (9th Cir. 1981). A contrary result would leave agents powerless to perform their investigative functions without the cooperation of suspects.[23]

▆▆▆ Applying this standard, we have no difficulty characterizing the agents' initial encounter with Oglesby. Had he attempted to drive away after they approached him, they could have pursued him. *See United States v. Thompson,* 558 F.2d at 524. The Constitution does not require them to have given him a head start. He was in the driver's seat with the motor running. Blocking the car was a reasonable precaution to ensure that the inquiry would not be terminated prematurely.[24]

Ordering Oglesby from the car was also a reasonable precaution. *See Pennsylvania v.*

---

**20.** *Cf. United States v. White,* 648 F.2d 29 at —— (D.C.Cir., 1981) ("What makes the case at hand difficult is the amount of force used to effectuate the stop.").

**21.** The Supreme Court has made clear that an investigatory stop is a "seizure," subject to Fourth Amendment constraints. *United States v. Cortez,* —— U.S. ——, ——, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). The seizure of a person is a complete restriction of liberty, if only for a short time. *Cf. United States v. Wylie,* 186 U.S.App.D.C. 231, 569 F.2d 62, 67 (1977) (when "the citizen's 'freedom to walk away' is not limited by anything other than his

desire to cooperate," there is no seizure; not even reasonable suspicion is required), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978).

**22.** *See also United States v. Perez-Esparza,* 609 F.2d 1284, 1287 (9th Cir. 1980) (detention for custodial interrogation; probable cause required).

**23.** *See* note 19 *supra.*

**24.** *Accord,* 3 W. LaFave, *supra* note 18, at 30 ("an otherwise valid stop is not inevitably rendered unreasonable merely because the suspect's car was boxed in by police cars in order

*Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) (officer may order driver out of car stopped for routine traffic violation). It would "def[y] logic to permit the policeman to order a minor traffic violator out of the car for the policeman's safety but not allow him to exercise the same precaution when making a valid *Terry* stop of suspected narcotics traffickers." *United States v. White,* 648 F.2d 29 at —— (D.C.Cir., 1981) (footnote omitted).

Although an innocent person in Oglesby's position might reasonably have believed he was not free to go, the force used was not excessive and the innocent person could not reasonably have assumed he was being taken into custody indefinitely. The stop was not an arrest.

### B. *Objective Basis for Suspicion?*

 The essential requirement for a valid investigatory stop is that it "be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez,* —— U.S. ——, ——, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (footnote and citations omitted). Based on all of the circumstances, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (citations omitted).[25]

 Oglesby had dropped off Martinson, who entered a home under surveillance.

He was at the wheel with the motor running, looking apprehensive. His brown station wagon matched the general description of an automobile earlier seen leaving another residence under surveillance in the same investigation, and agent Rowe informed agent Fitzgerald of this similarity after driving his car to block Oglesby's. The back of the car contained band instruments in plain view, and Fitzgerald had heard that the suspected source of drugs played in a band.[26] Under these circumstances, Oglesby's presence and appearance justified a brief stop to freeze the status quo while the agents inquired about his possible involvement in the activities being investigated. *See United States v. Cortez,* —— U.S. at ——, 101 S.Ct. at 696.

Because Oglesby was properly stopped for investigation and properly arrested when probable cause appeared, his conviction must be affirmed.[27]

### CONCLUSION

The convictions of Patterson, Flintoff, and Martinson are REVERSED. The conviction of Oglesby is AFFIRMED.

POOLE, Circuit Judge, concurring specially.

I concur in the reversal of the convictions of appellants Patterson, Martinson, and Flintoff, for the reasons stated in the majority opinion. I also concur in affirming appellant Oglesby's conviction. However, I do not believe it is possible to justify the officers' approach to Oglesby on a founded suspicion analysis. Oglesby had never been

---

to prevent it from being moved") (footnote omitted).

**25.** Oglesby's statement that he had a gun came as he emerged from the car, and other statements followed. Before he said anything, his car was blocked and he was ordered to get out with his hands in sight. If this initial stop was unwarranted, Oglesby's statements immediately following it are inadmissible. The law is well settled that facts asserted to justify a search or seizure must be known to officers at the time of the search or seizure. *See Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968) (probable cause). Subsequent admissions provide no "bootstrap" justification. *United States v. Allen,* 644 F.2d 749,

751 & n. 4 (9th Cir. 1980) (corrected copy). We must therefore determine whether the stop was based on an objective manifestation of criminal activity.

**26.** Oglesby disputed this point and raised questions about the agent's ability to see the band instruments when he closed in, but the district court resolved the factual question against Oglesby and we cannot say that its finding was clearly erroneous.

**27.** To ask Oglesby whether he had anything else, after he mentioned the gun, was quite normal. The question could refer to other weapons. The agent did not refer to drugs.

seen by the officers during this long investigation. The only "objective manifestations" that Oglesby was, or was about to be, involved in criminal activity were vague references to things that one of the officers heard, from a source unidentified to us, about the color of a car seen at another point during the stakeout, and the connection of someone with a band. Such tenuous assertions cannot form the basis for founded suspicion. Had Oglesby remained silent, I would hold that there was no basis for an investigatory stop and that his conviction should be reversed.

However, Oglesby did not remain silent; rather, immediately and voluntarily he told the officers that he had a gun. In these circumstances, justification of the officers' approach to him becomes unnecessary. Even without prior reason to connect Oglesby with any wrongdoing, once he had spontaneously confessed to possession of a concealed weapon, they were justified in taking it and in arresting him. I do not think that justice is served by stretching for founded suspicion, especially where the exercise is not necessary. Hence, I would affirm Oglesby's conviction on these grounds.