STATE OF NORTH CAROLINA
v.
XAVIER LAMONT MAJETT
No. COA08-1076
Court of Appeals of North Carolina.
Filed May 5, 2009
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Martin T. McCracken, for the State.
Appellate Defender Staples S. Hughes, by Assistant Appellate Defender Andrew DeSimone, for Defendant.
STEPHENS, Judge.

I. FACTS and PROCEDURE
After preserving the right to appeal the trial court's denial of Defendant's motion to suppress, Defendant Xavier Lamont Majett pled guilty to possession with intent to sell and deliver cocaine, trafficking in cocaine, and having attained habitual felon status. By judgment filed 24 April 2008, Judge Gregory imposed a prison sentence of 107 to 138 months. From the order denying Defendant's motion to suppress, and the judgment imposing a prison sentence of 107 to 138 months, Defendant appeals.
On 19 September 2006, Detective Cardwell of the Winston-Salem Police Department received a call from Detective Singletary who advised Cardwell of information that Singletary had received from an unidentified informant. According to the informant, Defendant was distributing cocaine from the residence at 808 Moravia Street and a white male driving a red Corvette was acting as a driver for Defendant. The informant further provided that the white male and the red Corvette should be at the 808 Moravia Street address.
Cardwell and Detective Morgan went to 808 Moravia Street ("the residence") where they observed a red Corvette parked across the street from the residence. A white male, later identified as James Baldwin, was in the driver's seat of the Corvette. The officers parked their vehicle approximately 200 yards from the residence and continued surveillance. The officers saw Baldwin get out of the Corvette and enter the residence. A van then arrived in front of the residence and parked. Two black males exited the van and entered the residence. The van left approximately two or three minutes later. About five minutes later, the two black males who had exited the van left the residence along with a third black male and walked into a residential neighborhood nearby. At this point, Singletary, along with Detectives Paul and James, arrived in the area of the residence. Cardwell relayed to Singletary what he and Morgan had observed at the residence. Singletary advised Cardwell that she, Paul, and James were going to approach the three men for further investigation. Singletary later informed Morgan and Cardwell that crack cocaine had been located on the three men when the men were searched.
As Cardwell and Morgan continued to conduct surveillance on the residence, they observed Baldwin and a black male, later identified as Defendant, leave the residence and get into the Corvette. Cardwell and Morgan notified other detectives who were assisting with the surveillance and called for a patrol car "to initiate a vehicle stop" as they "were going to get the vehicle stopped[.]" Morgan also spoke with Singletary who told Morgan "to get the vehicle stopped at some time." The Corvette, driven by Baldwin, was followed by an unmarked police vehicle driven by Paul and a marked police vehicle, while Morgan and Cardwell "paralleled the vehicle[,]" sometimes "behind it and at some points . . . on the side streets watching it[.]" Although the Corvette did not exceed the speed limit or break any motor vehicle laws, the Corvette made several turns through the neighborhood. Morgan testified that "[t]he route this subject was taking was not the most direct route where we thought he might be going to." Cardwell testified that in his experience, individuals driving in such a manner "are oftentimes doing counter surveillance . . . looking for vehicles following them, surveying the neighborhood to see if they recognize the same vehicle circling around in an attempt to identify undercover police officers." When Morgan and Cardwell eventually ended up in front of the Corvette, they saw the marked patrol car behind the Corvette "turn on its blue lights and try to initiate a traffic stop." Morgan and Cardwell "could see both subjects in the vehicle turn around and look back toward the vehicle. Then they both turned around and continued  the vehicle continued going forward." Even though "[t]he vehicle wasn't traveling fast[,] . . . it wasn't stopping," so Morgan "decided that I was going to block the vehicle with my vehicle." Paul testified that the Corvette "came to a stop one time, the patrol car had blue lighted him. He came to a stop and then . . . he moved a little further, maybe a foot or two, as if he was going to keep going." Morgan pulled out in front of the Corvette, blocking the road. Paul pulled his vehicle up on the left side of the Corvette, another police vehicle pulled up behind the Corvette, and the curb was on the right side of the Corvette so the suspects "didn't have too much room to do anything[.]" Cardwell exited his vehicle and approached the passenger side of the Corvette, shouting commands. Morgan then stepped out of the vehicle with his gun ata "high ready" and approached the Corvette, shouting at Defendant and Baldwin to put their hands up. While Defendant complied, Baldwin did not. Cardwell opened the passenger side door of the Corvette and as Defendant was exiting the vehicle, Cardwell took him by the arm and instructed him to lie on the ground, where he was handcuffed. Defendant was then taken off the ground and led away from the Corvette.
When Baldwin would not comply with the officers' orders to show his hands, Paul pulled his weapon out and "applied three strikes to the head with my foot." With the help of other officers, Paul then physically removed Baldwin from the car. Baldwin was placed on the ground, handcuffed, picked up off the ground, and placed on the hood of the vehicle. At that time, Baldwin spit out white flakes which were later determined to be cocaine. A search of the interior of the Corvette revealed white flakes of crack cocaine.
Paul approached Defendant, who was standing handcuffed beside another officer, and without first advising Defendant of his Miranda rights, asked Defendant if he had any drugs on his person. Defendant nodded his head, which Paul interpreted to mean yes. Paul then asked Defendant where the contraband was hidden and advised Defendant that if it was found at the jail, it would result in another felony charge. Defendant did not respond. Detective Paul arrested Defendant. A short time later, upon entering the detention center, Defendant informed Paul that drugs were hidden in his shoe. Paul subsequently recovered 29 grams of cocaine from Defendant's shoe.
Prior to trial, Defendant moved to suppress the evidence obtained as a result of his being detained and searched. Specifically, Defendant claimed the officers did not have cause to stop or detain Defendant and the officers failed to Mirandize Defendant prior to searching him. The trial court granted the motion as to "any responses of the [D]efendant to questioning by Detective Paul as to whether the [D]efendant had any drugs" since Defendant was "in custody[,]" having been handcuffed and placed on the ground, without having been read his Miranda rights. The court denied the motion as to Defendant's statement that he had drugs in his shoe and as to the 29 grams of cocaine found in Defendant's shoe on the grounds that the police officers' initial actions amounted to no more than an investigatory stop; the policemen had reasonable suspicion to make the stop; and the officers' actions did not exceed the limits of an investigatory stop. Defendant's appeal followed.

II. DISCUSSION
Defendant argues that the trial court erred in denying his motion to suppress. Specifically, Defendant asserts that he was arrested when he was surrounded by police and forcibly removed from the Corvette, and that the officers lacked probable cause to effectuate such arrest.
"[T]he standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. The trial court's conclusions of law, however, are fully reviewable."State v. Nixon, 160 N.C. App. 31, 33, 584 S.E.2d 820, 822 (2003).

A. Arrest
"[A] person is `seized' . . . when, by means of physical force or a show of authority, his freedom of movement is restrained[,]" United States v. Mendenhall, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 509, reh'g denied, 448 U.S. 908, 65 L. Ed. 2d 1138 (1980), and " in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. at 554, 64 L. Ed. 2d at 509 (footnote omitted). A seizure may be either a "stop" or an "arrest." Terry v. Ohio, 392 U.S. 1, 10, 20 L. Ed. 2d 889, 899 (1968).
An investigatory "stop" has been defined as "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information," Adams v. Williams, 407 U.S. 143, 146, 32 L. Ed. 2d612, 617 (1972), and allows a "limited search . . . not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence[.]" Id. However, "'[w]hen a law enforcement officer, by word or actions, indicates that an individual must remain in the officer's presence . . ., the person is for all practical purposes under arrest if there is a substantial imposition of the officer's will over the person's liberty.'" State v. Zuniga, 312 N.C. 251, 260, 322 S.E.2d 140, 145 (1984) (quoting State v. Sanders, 295 N.C. 361, 376, 245 S.E.2d 674, 684 (1978)). "A `formal' declaration of arrest by an officer is not a prerequisite to the making of an arrest." Id.; see also State v. Tippett, 270 N.C. 588, 596, 155 S.E.2d 269, 275 (1967).
No bright line separates an investigatory stop from an arrest. Whether a seizure constitutes an arrest depends on whether a reasonable person would perceive, while being detained, based on all the surrounding circumstances, including the extent that the person's freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop, United States v. Beck, 598 F.2d 497, 500, 501 (9th Cir. 1979), that he is "under arrest" as commonly understood, in that he is likely to be detained for an indefinite or extended period of time. United States v. Patterson, 648 F.2d 625, 632 (9th Cir. 1981). In State v. Wrenn, 316 N.C. 141, 340 S.E.2d 443 (1986), a police officer responded to a call reporting a burglary at an apartment complex. The suspect was described as a white male, dressed in a dark sweat suit, possibly wearing a knit hat, and possibly armed. As the officer approached the apartment complex, he observed a vehicle leaving the complex which was being operated by a man fitting the suspect's description. The officer stopped defendant's vehicle, opened the door, ordered defendant out of the car at gunpoint, and ordered defendant "'to keep his hands where I could see them.'" Id. at 146, 340 S.E.2d at 447. The officer's subsequent search of defendant's vehicle revealed a loaded revolver in a holster in an unlocked console in the front seat of the vehicle. Although the officer testified that he arrested defendant after discovering the revolver in the car, this Court determined that "defendant was under arrest at the point the officer[] held him at gunpoint as a suspect in the reported crime " since it was unlikely that he was going to willingly allow defendant to leave his presence. Id.
In this case, at least three police cars, with at least six police officers, boxed in the Corvette in which Defendant was riding and forced it to stop. Cardwell exited his police car and walked to the passenger side of the Corvette, yelling at Defendant to show his hands. Detective Morgan also got out of his police car"with my weapon at a high ready" and "[kept] my weapon trained on  at this time it was the passenger (Defendant) of the vehicle." Even though Defendant complied with Cardwell's orders, Cardwell "did an extraction or removed [Defendant] from his vehicle[,]" put Defendant on the ground, and handcuffed him. Morgan kept his gun on Defendant until Cardwell "had him on the ground and secured him up."
After Defendant had been moved away from the Corvette in handcuffs, Paul asked Defendant if Defendant had any drugs on his person. Paul testified that Defendant "kind of lowered his head, and, you know, nodded his head  in a[n] up and down motion." Paul "interpreted that as being a, yes, that he did have some type of narcotics on his person." Paul "figured it to be cocaine" and asked Defendant where the drugs were. After asking Defendant several more questions about where the drugs were located, and receiving no response from Defendant, Paul "kind of figured that it was somewhere where we couldn't get it from out there" and Paul told Defendant he was under arrest for cocaine.
As in Wrenn, here Defendant's vehicle was stopped and Defendant was ordered out of the car at gunpoint. Additionally, as in Wrenn, Defendant was ordered to keep his hands up where the officers could see them. Furthermore, in this case three police cars and at least six police officers boxed the Corvette in "so [the suspects] didn't have too much room to do anything[,]" as opposed to the single officer who effectuated the seizure in Wrenn. Unlike in Wrenn, where there was no indication that the defendant was physically restrained, in the present case, Defendant was removed from the Corvette, forced to the ground, and handcuffed. Although Paul testified that he placed Defendant under arrest later and only after surmising that Defendant had cocaine on his body, Paul's declaration was not determinative of when the arrest actually occurred. Zuniga, 312 N.C. at 260, 322 S.E.2d at 145. The evidence establishes that there was a substantial imposition of the officers' will over Defendant's liberty such that Defendant understood he was not free to leave the presence of the officers for an indefinite or extended period of time when the police cars surrounded the Corvette, and the officers removed Defendant from the car at gunpoint, forced him on the ground, and handcuffed him. Accordingly, we conclude Defendant was placed under arrest when he was removed from the car at gunpoint, forced on the ground, and handcuffed.

B. Probable Cause
A police officer must have probable cause to effectuate a warrantless arrest. State v. Mills, 104 N.C. App. 724, 728, 411 S.E.2d 193, 195 (1991). "Probable cause exists where `the facts and circumstances within their [the officers'] knowledge, and ofwhich they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Mills, 104 N.C. App. at 728, 411 S.E.2d at 195 (quoting Brinegar v. United States, 338 U.S. 160, 175-76, 93 L. Ed. 1879, 1890 (citation omitted), reh'g denied, 338 U.S. 839, 94 L. Ed. 513 (1949)). "[W]hether probable cause has been established is a `common sense, practical question' based on `the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.'" State v. Riggs, 328 N.C. 213, 219, 400 S.E.2d 429, 433 (1991) (quoting Illinois v. Gates, 462 U.S. 213, 230-31, 235-36, 76 L. Ed. 2d 527, 543-44, 546, reh'g denied, 463 U.S. 1237, 77 L. Ed. 2d 1453 (1983)).
In determining whether probable cause existed to effectuate an arrest, a court may consider (1) the time of day; (2) the defendant's suspicious behavior; (3) flight from the officer or the area; and (4) the officer's knowledge of defendant's past criminal conduct. Mills, 104 N.C. App. at 729, 411 S.E.2d at 196 (internal citations omitted).
Furthermore, where probable cause is based on an informant's tip, probable cause is determined by a totality of the circumstances test, assessing the relative weights of all the various indicia of reliability and unreliability. State v. Collins, 160 N.C. App. 310, 314-15, 585 S.E.2d 481, 485 (2003) (quotation marks and citations omitted), aff'd per curiam, 358 N.C. 135, 591 S.E.2d 518 (2004). "The indicia of reliability may include (1) whether the informant was known or anonymous, (2) the informant's history of reliability, and (3) whether information provided by the informant could be and was independently corroborated by the police." Id. at 315, 585 S.E.2d at 485. "An informant's tip is more reliable if it contains a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." Id. (quotation marks and citation omitted).
In the present case, the trial court concluded that Detective Cardwell had reasonable suspicion that Defendant was engaging in criminal drug activity based on the totality of the following factors:
(a) the officer's personal observations and his opinions based on his training and experience as well as information shared with Detective Cardwell by the other police officers;
(b) the information from the informant that the defendant was preparing and selling drugs from a house located at 808 Moravia Street and would be riding in a red Corvette driven by a white man;
(c) that independent police work and observations of Detective Cardwell and the other trained and experienced detectives corroborated significant details of the tip or information that came from the informant;
(d) [t]hat three men were observed going into the said house on Moravia Street; two of them arriving in a van which left before they came out; the three men stayed only five minutes, and then upon being searched, it was discovered that cocaine was on one or more of their persons;
(e) that the defendant, upon leaving a short time after the three black men, was in a vehicle that rode around several blocks which, in the opinion of an experienced and trained narcotics officer, is consistent with conduct of drug dealers who are trying to see if they are being followed or if undercover drug officers are in the area;
(f) that the defendant and the driver turned to look at the marked police patrol car that was following the Corvette in which the defendant was a passenger;
(g) and that the Corvette did not stop immediately when the blue light of the police car[] was turned on, even though the driver of the Corvette had an opportunity to stop before it was blocked by Detective Morgan.
We need not determine if the totality of these factors provided the officers reasonable suspicion to initiate an investigative stop as the officers were required to have probable cause to effectuate the arrest. We conclude that these factors do not establish the probable cause needed to effectuate the warrantless arrest. The police officers following the Corvette observed nothing illegal about the manner in which the Corvette was driven and the trial court found that "[t]he Corvette did not exceed the speed limit and no motor vehicle laws were broken." When the officers arrested Defendant, "[i]t was a well-lit, nice day." Although Morgan testified that he recognized Defendant from "prior dealings" Morgan had with Defendant, there is no evidence that these "dealings" were based on Defendant's past criminal conduct. The trial court found that "[t]he Corvette drove around several blocks" and that "[i]n the opinion of Detective Mike Cardwell, . . . it was a common tactic[] of drug dealers to drive around several blocks to see if they are being followed[.]" While this could be considered suspicious behavior, it does not provide probable cause for an arrest. Furthermore, even though the Corvette driven by Mr. Baldwin did not stop immediately after the police car turned on its blue light, such behavior can hardly be considered "flight from the officer or the area [,]" Mills, 104 N.C. App. at 729, 411 S.E.2d at 196, where the evidence shows that the Corvette initially continued driving slowly, came to a stop and then moved "maybe a foot or two[,]" and stopped before it arrived at the next intersection. Furthermore, Cardwell testified that Defendant complied with Cardwell's orders to show his hands and to exit the vehicle. With regard to the anonymous tip, none of the officers who testified were aware of the identity of the informant and there was no indication that the informant had provided law enforcement with reliable information in the past. Although the officers were able to corroborate the informant's tip that a white male and a red Corvette should be at the 808 Moravia Street address, such facts were easily obtainable from observation of the residence at the time of the tip. Furthermore, the tip did not contain any "details relating . . . to future actions of third parties ordinarily not easily predicted." Collins, 160 N.C. App. at 315, 585 S.E.2d at 485. Although the police searched the three males who left the residence and located cocaine on their persons, there was no evidence that the officers questioned the three males about where they got the cocaine. Finally, while the informant indicated that Defendant was distributing cocaine from the residence, the officers had no information that cocaine was located in the Corvette. Accordingly, based on the totality of the circumstances in this case, we hold that the arresting officers did not have probable cause to arrest Defendant.

C. Exclusion of Evidence
When a person is illegally arrested, any inculpatory statement made, or physical evidence seized, must be suppressed "unless the State can show the causal chain was broken by some independent circumstance[.]" State v. Allen, 332 N.C. 123, 128, 418 S.E.2d 225, 228 (1992); see Wong Sun v. United States, 371 U.S. 471, 484-88, 9 L. Ed. 2d 441, 453-55 (1963).
Here, the State has made no showing that the causal chain between the illegal arrest of Defendant, and Defendant's inculpatory statement and the cocaine seized from Defendant's shoe, was broken by some independent circumstance. To the contrary, Defendant's statement and the physical evidence seized were a direct result of Defendant's illegal arrest. Accordingly, the evidence must be suppressed as it was the "fruit" of an illegal arrest, Wong Sun, 371 U.S. at 485, 9 L. Ed. 2d at 453, and the trial court erred in denying Defendant's motion to suppress.
REVERSED.
Judges JACKSON and STROUD concur.
Report per Rule 30(e).