UNITED STATES of America,
Plaintiff–Appellee,

v.

Vickie J. WYLIE, Defendant–Appellant.

No. 89–6105.

United States Court of Appeals,
Fifth Circuit.

Dec. 13, 1990.

Constance Y. Singleton, Houston, Tex., for defendant-appellant.

Paul Naman, Asst. U.S. Atty., Bob Wortham, U.S. Atty., Beaumont, Tex., for plaintiff-appellee.

Before POLITZ, WILLIAMS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Vickie J. Wylie was convicted after a jury trial of conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and possession with intent to distribute cocaine in violation of 21 U.S.C. § 846. She received a sentence of 63 months consecutively on each of the charges and a fine of $250,000.

On appeal, Wylie challenges both her conviction and sentence, arguing (1) that the court's acceptance of a co-conspirator's altered indictment, which no longer mentioned Wylie, constituted a de facto dismissal of her from the indictment; (2) that the affidavit in support of the search warrant lacked probable cause; (3) that the district court made several erroneous evidentiary rulings at trial; (4) that Wylie was denied her sixth amendment right to a fair and impartial jury because of the court's use of overlapping juries; and (5) that the upward departure in her sentence was impermissible. Finding no error, we affirm.

I.

On March 11, 1988, Benjamin Williamson mailed a package from a pharmacy in Buna, Texas, that acted as a pickup service for United Parcel Service (UPS). It was addressed to Ricky Alexander in Minnesota. While Williamson claimed that the package contained coffee, the UPS became suspicious and later opened it to find several packets of cocaine. The UPS supervisor turned the package and its contents over to the Beaumont, Texas, Police Department, which in turn gave the items to the Drug Enforcement Administration's (DEA) office there.

The DEA then sent the package to its office in Minnesota. An agent from the Minnesota office received the package and called the Minnesota forwarding address, a motel, in order to arrange a controlled delivery to Alexander. The agent learned that Alexander had checked out but had left instructions and money for shipment of the package, when it arrived, to Route 1, Box 460, Buna, Texas, which was Wylie's home address. The agent also called a telephone number Alexander had left and spoke with a female who claimed to be Alexander's wife and who confirmed the address in Buna and said someone would be there to receive the package.

The agent returned the package to the DEA's office in Beaumont, which attempted a controlled delivery. Once the package was delivered to Wylie's residence, a search warrant was obtained; a search of the house was conducted, and various items such as cocaine, drug paraphernalia, books, ledgers, and weapons were seized. As the search was in progress, Wylie drove up; her car was then searched, and $20,900 in cash and a significant quantity of cocaine were found in the trunk.

The defendant owned and operated a horse ranch in Buna. Her live-in boyfriend, John Hamilton, was a jockey and a horse trainer who worked full-time for Wylie. Williamson also worked at the ranch as an employee under Hamilton. At trial, the government introduced evidence demonstrating that Hamilton and Williamson were constant drug users. Although Wylie did not use drugs herself, the prosecutor implied that she was the chief financial supplier for the purchase of the cocaine that was found in her car and house.[1] The prosecutor further claimed that Wylie kept detailed records of her drug sales and attempted to conceal her role in the affair through threats, intimidation, and bribery.

The main testimony presented by the government during its case-in-chief was received from two narcotics agents and Williamson. Significant rebuttal witnesses for the government were Jeri Jackson, who was Hamilton's former wife and an acquaintance of Wylie's, and Kenneth Williams, a Louisiana police officer who testified and presented a tape of Hamilton's statement implicating Wylie in past drug purchases. Wylie challenged the bulk of the government's evidence and testimony presented at trial.

---

1. The record indicates that approximately $25,-000 and 224.05 grams of cocaine were found in Wylie's car and home.

Wylie, along with Hamilton and Williamson, was charged in a two count indictment with conspiracy and possession with intent to distribute cocaine. The conspiracy count recited five overt acts, only the last of which involved Wylie.

Hamilton pleaded guilty to both counts, without a plea bargain. He agreed to plead guilty on the condition that Wylie's name be stricken in every instance from the indictment. Her name was stricken by the court as "surplusage," and Hamilton's guilty plea was accepted. Nevertheless, Wylie was convicted by a jury on both counts. Williamson cooperated with the government's investigation and received a lesser sentence of 33 months.

## II.

■ Wylie contends that the district court's acceptance of Hamilton's altered indictment, which then no longer mentioned Wylie, was a de facto dismissal of her from the indictment. When dealing with questions of law governing the sufficiency of such an indictment, we utilize a de novo standard of review. *United States v. Mann*, 517 F.2d 259, 266–67 (5th Cir.1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976).

According to Fed.R.Crim.P. 12(b)(2), Wylie can raise objections based upon defects in her indictment only prior to trial. *United States v. Smith*, 890 F.2d 711, 715 (5th Cir.1989); *United States v. Kimberlin*, 805 F.2d 210, 226 (7th Cir.1986), *cert. denied*, 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987). Failure to make such a motion timely results in a waiver of such rights. Fed.R.Crim.P. 12(f); *see Smith*, 890 F.2d at 715. The trial court, however, has discretion to grant relief from the waiver for good cause. Rule 12(f). It does not appear from the record that Wylie made objections to her indictment prior to trial, nor does it appear that she had good reason for failing to do so. *See United States v. Munoz*, 894 F.2d 292, 295 (8th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 1934, 109 L.Ed.2d 297 (1990).

If the deletion of Wylie's name can be considered a failure of the indictment to state an essential element of the crime, *see United States v. Wilson*, 884 F.2d 174, 179 (5th Cir.1989), she might have a valid claim under rule 12(b)(2). *See United States v. Campos–Ascencio*, 822 F.2d 506, 508 (5th Cir.1987). Such a failure to specify the nature of an offense may be raised at any time. The theory underlying this exception to rule 12(b)(2) is that failure to inform a defendant of the full nature of the charges against her may result in a deprivation of her fifth and sixth amendment rights. *Wilson*, 884 F.2d at 179 n. 8; *see Russell v. United States*, 369 U.S. 749, 763–65, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962). The sixth amendment requires that the defendant "be informed of the nature and cause of an accusation" in order to prepare her defense and possibly invoke the protections against double jeopardy, and the fifth amendment requires that a person charged with a serious crime receive a grand jury indictment. *Wilson*, 884 F.2d at 179 n. 8.

Nevertheless, the exception is less readily available to defendants at the appellate level. Where "the defendant demonstrates no prejudice and waits for appeal to assert his challenge, an appellate court will read the indictment liberally." *Id.* at 179 (quoting *Campos–Ascencio*, 822 F.2d at 508). Under such circumstances, an indictment will be "sufficient unless it is so defective that by any reasonable construction, [it fails to] charge an offense for which the defendant is convicted." *United States v. Trollinger*, 415 F.2d 527, 528 (5th Cir.1969) (per curiam).

We have not considered heretofore whether the deletion of a defendant's name from an amended indictment is considered an "essential element" of a crime. However, a case from the Ninth Circuit supports the proposition that a defendant's name is an essential component of an indictment. In *Chow Bing Kew v. United States*, 248 F.2d 466, 468–69 (9th Cir.), *cert. denied*, 355 U.S. 889, 78 S.Ct. 259, 2 L.Ed.2d 188 (1957), the court dismissed one of the two counts against the defendant because the indictment failed to include either his name or a reference to him, in

violation of Fed.R.Crim.P. 7(c).[2]

Utilizing the requirements of rule 7(c)(3) (which governs harmless error in an indictment's citations or statutes), a similar standard can be developed for determining whether deletion of a defendant's name from an indictment is an "essential element." Such a standard requires that the error not prejudicially mislead the defendant. *United States v. Quintero*, 872 F.2d 107, 117 (5th Cir.1989), *cert. denied*, ——— U.S. ———, 110 S.Ct. 2586, 110 L.Ed.2d 267 (1990).

While the district court questioned the government's removal of Wylie's name from the indictment as mere surplusage to Hamilton's plea, we conclude that this rather awkward prosecutorial device does not jeopardize the conviction in this limited instance. Wylie points out that the use of the term "surplusage" normally implies "irrelevant allegations which call for inadmissible evidence stricken on the motion of the defendant." 1 L. Orfield, *Criminal Procedure Rules* § 7:124 (2d ed. 1985); *see* Fed.R.Crim.P. 7(d).

■ The government cannot utilize the surplusage procedure of rule 7(d) to remove from the indictment any matters that it plans to prove through evidence at trial. *United States v. Thomas*, 875 F.2d 559, 562 n. 2 (6th Cir.), *cert. denied*, ——— U.S. ———, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989). Although the removal of Wylie's name from the indictment is pursuant to an informal understanding between Hamilton and the government, it was Hamilton's, not the government's, responsibility to request its removal. Such removal was done purportedly to allow Hamilton to plead guilty to intending to possess cocaine while disavowing any complicity with Wylie.

Indeed, the government is proscribed by the sixth amendment from altering indictments on its own volition. Contrary to Wylie's assertions, Fed.R.Crim.P. 7(e) does not allow the government to amend an indictment; the rule refers only to the amending of an information. Fed.R. Crim.P. 7(e) note; *Fredrick v. United States*, 163 F.2d 536, 547 (9th Cir.), *cert.*

*denied*, 332 U.S. 772, 68 S.Ct. 87, 92 L.Ed. 357 (1947) (citing *Muncy v. United States*, 289 F. 780, 781 (4th Cir.1923)).

It is also "reversible error per se to amend an indictment without resubmission to the grand jury, if it is possible that the accused will be tried and convicted of a crime other than that alleged in the indictment." *United States v. Ramirez*, 670 F.2d 27, 28–29 (5th Cir.1982); *see Stirone v. United States*, 361 U.S. 212, 217–18, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). Permissible amendments are those that do not alter the charges against an accused nor, as in the present case, remove and reinstate parties in indictments. Indeed, it appears that such important changes in an indictment should be left up to grand juries themselves. *Muncy*, 289 F. at 785.

The government's expanded use of the surplusage motion could violate a defendant's fifth and sixth amendment rights and result in judicial inefficiency. As Wylie points out, this use of the surplusage power may create problems with the validity of guilty pleas and with collateral estoppel entanglements. Moreover, by removing Wylie's name from the indictment, the government risks misleading her concerning the pendancy of charges against her, thus possibly subjecting her to double jeopardy and denying her the right to be indicted by a grand jury.

■ In permitting the government's use of the surplusage power in this case, we conclude that the relevant test is whether the amended indictment in fact prejudicially misled the defendant. Under this standard, Wylie does not qualify under the particular circumstances of this case.

The government's only agreement with Hamilton was that he would not plead guilty to conspiracy or possession of narcotics with Wylie. While Hamilton agreed to testify that he was guilty of these crimes, he did not wish to implicate Wylie. The prosecution met this wish not by dismissing its indictment against Wylie but

---

**2.** The court explained that "[t]he trial court cannot supply the omission and thus create jurisdic-

tion. Nor can the defendant indict himself...." 248 F.2d at 468–69.

only by deleting her name as surplusage to Hamilton's own plea.

The evidence demonstrates that the government did not intend to dismiss Wylie from her indictment, nor did it move to do so. Its actions merely conformed the charges to which Hamilton pleaded to the facts to which he was willing to admit. Since the deletion of the name "Vickie Wylie" for the purpose of Hamilton's plea did not alter the charges against him, Wylie's name was surplusage to Hamilton.

Wylie was still able to prepare an adequate defense. She could not reasonably have been under the impression that charges against her had been dropped. During the proceedings involving Hamilton's guilty plea, which Wylie's attorney attended, the prosecutor informed the court that the charges against Wylie still were pending. There was thus no hint that the government had abandoned its separate effort to convict Wylie pursuant to the indictment. Moreover, given the late objection to her indictment, Wylie cannot overcome the relatively easy "reasonable construction" standard by which the government can substantiate its assertion that charges against her were still active.

### III.

Wylie next maintains that the affidavit in support of the search warrant lacked probable cause. We disagree. Based upon the record presented on appeal, we find that the affidavit demonstrated probable cause and that the police officers' eventual reliance upon the warrant was objectively reasonable.

We utilize two standards of review in this context. When deciding upon the magistrate's determination of probable cause, we use a substantial basis standard. *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir.1978); *Bastida v. Henderson*, 487 F.2d 860, 863 (5th Cir.1973). In reviewing the court's decision regarding the objective reasonableness of an officer's reliance upon a warrant, we employ a de novo approach. *United States v. Tedford*, 875 F.2d 446, 448 (5th Cir.1989). To determine whether probable cause exists to authorize a search, a magistrate "is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Peden*, 891 F.2d 514, 518 (5th Cir.1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

■ The present case involves the issuance by a magistrate of an anticipatory search warrant that authorizes the search of premises when it is known that contraband is on a sure course to its destination there. While we previously have not squarely addressed this issue, five other circuit courts of appeals have approved of anticipatory search warrants. *United States v. Garcia*, 882 F.2d 699, 702–04 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989); *United States v. Dornhofer*, 859 F.2d 1195, 1198 (4th Cir. 1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989); *United States v. Goff*, 681 F.2d 1238, 1340 (9th Cir.1982); *United States v. Lowe*, 575 F.2d 1193, 1194 (6th Cir.), *cert. denied*, 439 U.S. 869, 99 S.Ct. 198, 58 L.Ed.2d 180 (1978); *United States ex rel. Beal v. Skaff*, 418 F.2d 430, 432–34 (7th Cir.1969). We join those courts today in approving of the use of anticipatory search warrants in appropriate instances.

In this case, the magistrate relied upon a detailed affidavit sworn to by Senior Special Agent Milton E. Shoquist of the DEA. That affidavit described the events that led to the delivery of the quantity of cocaine to Wylie's residence.

First, the affidavit stated that while government agents made the delivery to Wylie's ranch in Buna, the delivery was pursuant to precise instructions from those involved in the narcotics operation. Second, the affidavit contained information from a state narcotics agent describing undercover purchases of marihuana that he

and another agent had made two years previously from Williamson.

Third, the affidavit spoke of information from a confidential informant to the effect that Benjie Williams a/k/a Ben Williamson worked for John Hamilton on a horse ranch in Buna. Fourth, the affidavit contained information from the agent that the confidential informant had been with Hamilton on four separate occasions to purchase cocaine in Louisiana and that Hamilton lived and worked on a ranch owned by defendant. And fifth, the document described how the UPS package was delivered to Wylie's ranch and accepted by its occupants.

The magistrate was also presented with affidavit testimony from Shoquist. Based upon his substantial training and experience, Shoquist described how large-scale narcotics traffickers maintain on hand large amounts of currency to conduct business, maintain detailed books and ledgers on the sale of drugs, often are involved in voluminous, concealed drug trafficking in their residences, and usually attempt to funnel their profits through legitimate businesses.

Although the affidavit lacked direct evidence that Wylie sold narcotics from her home, the magistrate might reasonably have drawn such common-sense conclusion from it. The evidence presented named her residence as the final dropping-off point for the controlled delivery package and demonstrated that suspected narcotics traffickers were known to frequent the ranch. If the magistrate did draw this conclusion, he also logically could conclude that there was a fair probability that Wylie maintained drugs and related paraphernalia of the type described in the affidavit.

Even if, *arguendo*, we were to second-guess the magistrate, "the fruits of this search" would be admissible under the good faith exception of *United States v. Leon*, 468 U.S. 897, 922–24, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984), and *United States v. Peden*, 891 F.2d 514, 519 (5th Cir.1989). In *Leon* the Court stated,

In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

468 U.S. at 926, 104 S.Ct. at 3422.

As the government indicates in this case, the various officers went to great lengths to determine the names and addresses of all the parties to this drug trafficking operation. Moreover, as the facts indicate, they carefully planned and monitored the controlled delivery to determine that the cocaine was actually accepted before they sought a search warrant. The facts also do not reflect any recklessness or dishonesty in the preparation of the affidavit. Although a part of the affidavit relied upon information supplied by a confidential source, the bulk of the evidence presented included information obtained from the controlled delivery of the cocaine-filled package and from testimony by an officer concerning the drug-selling record of one of the scheme's participants.

■ Even if the affidavit lacked probable cause, evidence obtained by law enforcement agents acting in objectively reasonable, good faith reliance upon a search warrant issued by a neutral magistrate is admissible. *Id.* There is no indication here that the affidavit contained false statements or that the magistrate abandoned his neutral function. Similarly, the agent could not have had any objectively reasonable doubt as to the existence of probable cause. Thus, it appears that the officers reasonably relied upon a facially valid warrant issued by a neutral magistrate. The fruits of the search of Wylie's home and automobile, therefore, are not subject to the exclusionary rule. *See id.*

## IV.

### A.

■ Wylie also contends that the court erred in permitting a rebuttal witness, Jeri Jackson, to testify while Fed.R.Evid. 615

was being invoked to sequester witnesses and while there was some indication that Jackson was present at trial and discussed prior testimony with other acquaintances of Wylie's. However, we conclude that the district court did not err in permitting Jackson to testify.

Rule 615[3] provides for the sequestration of witnesses during trial. Its main purpose is to aid in detecting testimony that is tailored to that of other witnesses and is less than candid. *United States v. Ell*, 718 F.2d 291, 293 (9th Cir.1983); *United States v. Lamp*, 779 F.2d 1088, 1095 (5th Cir.), *cert. denied*, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *see* 6 J. Wigmore, *Evidence* § 1840 (Chadbourn rev. 1976). In *United States v. Ortega–Chavez*, 682 F.2d 1086, 1089 (5th Cir.1982), we observed,

> While Rule 615 sequestration is mandatory, this Court has held that a trial court has discretion to allow the testimony of a witness who has violated the Rule and that a party must demonstrate an abuse of discretion and 'sufficient prejudice' to warrant reversal on account of such testimony. *United States v. Womack*, 654 F.2d 1034, 1040 (5th Cir.1981), *cert. denied* [454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982).]

In evaluating whether an abuse of discretion has occurred, the focus is upon whether the witness's out-of-court conversations concerned substantive aspects of the trial and whether the court allowed the defense fully to explore the conversation during cross-examination. *United States v. Buchanan*, 787 F.2d 477, 484–85 (10th Cir. 1986), *cert. denied*, — U.S. —, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990). We also use a de novo standard for our review of the record to determine whether the defendant suffered "sufficient prejudice" to warrant reversal on account of such witness's testimony. *See Womack*, 654 F.2d at 1040.

The facts of *Ortega–Chavez* are similar to those here. Both cases involve disputes concerning "government rebuttal witnesses, who were present in the courtroom during previous testimony" and "were allowed to testify despite a sequestration order made pursuant to Fed.R.Evid. 615." *Ortega–Chavez*, 682 F.2d at 1089. In *Ortega–Chavez*, we found no abuse of discretion or prejudice. *Id.* at 1090. We stated that the rebuttal witnesses' testimony merely confirmed that of the other witnesses and that the government should not be faulted for calling the witnesses on rebuttal instead of during its case in chief, as it had no reason to perceive that such testimony would be necessary until it heard the testimony of another witness. *Id.*

Similarly, Wylie is unable to show either an abuse of discretion or sufficient prejudice from the testimony of Jackson. Although Wylie contends that Jackson's out-of-court conversations concerned substantive aspects of the trial, she does not specifically state what portions of Jackson's testimony were either tailored or less than candid. The court, at a special hearing concerning the admissibility of Jackson's and another witness's testimony, decided that Jackson was present at trial only for irrelevant testimony and that her conversations involved only generalities.

Also, while Wylie maintains that she was not permitted to cross-examine Jackson fully concerning her conversations, she fails to consider that the judge questioned Jackson at trial concerning her conversations and that this evidence was heard by the jury. Indeed, Wylie had ample opportunity to question Jackson during the hearing, regarding her testimony and outside conversations.

■ Wylie also has failed to prove "sufficient prejudice" to warrant a reversal. Although Jackson's testimony specifically proved damaging to Wylie, she merely confirmed that Wylie was in possession of

**3.** Rule 615 provides,

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party

who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

narcotics and a large amount of currency, two facts that were substantiated by other testimony and evidence.

Moreover, the government contends that it did not learn of such evidence until Jackson herself presented it. While such information may have been presented better in the government's case-in-chief rather than in rebuttal, it cannot always be expected that the government will be able to obtain such testimony, as sometimes it must wait for witnesses to approach it with information.

The relatively late introduction of this evidence and the surrounding circumstances were taken into account by the district court. Considering the complex social relationships enjoyed by the participants in this case, it should not be expected that the government would identify every possible witness or present only those with no personal involvements or alleged animosities. Consequently, we reject Wylie's argument regarding the admission of Jackson's testimony.

### B.

■ Wylie contends that the court erred in admitting the testimony of a police officer and his tape of the co-defendant's statement in an unrelated criminal investigation implicating Wylie in an illegal narcotics transaction. In reviewing the district court's evidentiary rulings, we utilize an abuse of discretion standard. *Jon–T Chems., Inc. v. Freeport Chem. Co.,* 704 F.2d 1412, 1417 (5th Cir.1983).

The testimony of the officer and his taped statements are admissible under the holding of *United States v. Caron,* 474 F.2d 506, 509 (5th Cir.1973). *Caron* holds that when a witness denies on direct examination his involvement with certain persons or criminal undertakings, he effectively "opens the door" to questions and evidence that the prosecutor can put to him to prove his connection with the person or activity. *Id.*

In *Caron,* the prosecution was able to put forth tape recordings gathered from wiretaps implicating the association of the defendant with known bookmakers. *Id.* at 508. Even if the evidence has been illegally obtained, it can be used for impeachment purposes after the witness or defendant mentions it on direct examination. *Leon,* 468 U.S. at 910, 104 S.Ct. at 3413; *United States v. Hernandez,* 646 F.2d 970, 974–77 (5th Cir. Unit B June 1981), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981); *see also United States v. Fogelman,* 586 F.2d 337, 340–41 (5th Cir.1978).

Thus, when Hamilton testified on direct examination that he had lied when he implicated Wylie in his partially taped conversation with Williams, a police officer, during a murder investigation, he effectively opened the door for the government's rebuttal evidence. As in *Caron,* the government introduced the actual tapes of the interrogation of Hamilton to prove that his direct testimony was inaccurate. And even if such evidence may have been obtained illegally (which it was not), it could still be used in this situation to impeach Hamilton's testimony. *Leon,* 468 U.S. at 910, 104 S.Ct. at 3413.

■ The reliability of Hamilton's statement also is not a factor here, as it is merely used to impeach his claim that he did not implicate Wylie in other narcotics offenses. Wylie also had an opportunity to cross-examine Williams after his rebuttal testimony. Such questioning satisfied her right of confrontation.

### C.

■ The court properly admitted Wylie's bookkeeping records into evidence. Contrary to Wylie's assertions, the search warrant was based upon a specific affidavit from an experienced DEA agent, who informed the magistrate of elaborate bookkeeping methods used by drug traffickers either to record their sales or to keep track of their money funneled into legitimate investments. In order to gather accurate information on that alleged drug-selling network, the magistrate issued the warrant for the search and/or confiscation of "[i]tems including papers, books, ledgers, records and other documents ... relating

to the packaging, distribution and use of controlled substances...."

Although we utilize a higher standard of proof for the seizure of books and personal papers than for tangible objects such as automobiles, *United States v. Whitmire*, 595 F.2d 1303, 1309 (5th Cir.1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980), this dual standard has been somewhat eroded. Narcotics traffickers have become more sophisticated; they utilize diaries or ledgers to further their crimes, as they realize that such items are less likely to be seized successfully with a search warrant. *See United States v. Cambeletta*, 874 F.2d 298, 305 (5th Cir. 1989). Since such books might have a legitimate nexus to the crime itself, they are increasingly subject to seizure. *See United States v. McCoy*, 515 F.2d 962, 964 (5th Cir.1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 795, 46 L.Ed.2d 649 (1976).

■ It is also not a corruption of the jury function to have juries decide whether a defendant's handwriting matches that in another document. Fed.R.Evid. 901(b)(3) allows triers of fact to determine the genuineness of handwriting themselves, and rule 901(b)(4) permits such a body to make judgments as to genuineness from distinctive characteristics taken in conjunction with the surrounding circumstances. Thus, we do not fault the government's decision here to cease to provide either new exemplars or additional testimony by handwriting experts, in favor of allowing a jury to pass judgment on the evidence "as is."

The opinion in *Dean v. United States*, 246 F. 568 (5th Cir.1917), is instructive here. *Dean* provides that

[w]hen the book containing the entries is a personal memorandum book, such as the owner customarily keeps in his own handwriting, such as a diary or an order book, or a memorandum of a personal itinerary, we think the character of the book and the custom of the owner of such a book to write the entries in it himself [constitutes] circumstances sufficient to go to a jury, and from which they may infer, if satisfied of it, that the owner or possessor of the book made the entries in it.

*Id.* at 576; *see* 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 901(b)(3)[02] at 39 (1990). Thus, the court's decision in this case to allow the jury to evaluate such information was not an abuse of discretion.

## V.

■ Wylie contends that she was denied her sixth amendment right to a fair and impartial jury through the court's use of overlapping juries. Two of the jurors who served on Wylie's jury were also selected to sit as jurors on a civil trial scheduled to begin on March 15, 1988, at 9:00 a.m. The jury in Wylie's case did not begin deliberations until 9:05 a.m. on the same day.

Because of such scheduling overlap, Wylie maintains that the jury was coerced into returning its verdict one hour and forty minutes later. We disagree and find that Wylie suffered no harm from the use of these overlapping juries.

On this issue we utilize two standards of review. For questions concerning a defendant's constitutional violations occasioned by the use of overlapping juries, we use a de novo standard. *See Byram v. United States*, 705 F.2d 1418, 1421 (5th Cir.1983). In reviewing a district court's determination of actual harm to defendants from this type of jury system, we use a clearly-erroneous standard. *See Curtis v. Commissioner*, 623 F.2d 1047, 1050–51 (5th Cir. 1980).

The government is correct in its assertion that Wylie waived her complaint by waiting until after the verdict to protest. *United States v. Bolinger*, 837 F.2d 436, 438–39 (11th Cir.1988). The rationale of *Bolinger* is "that a defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct." *Id.* at 438 (quoting *United States v. Jones*, 597 F.2d 485, 588 n. 3 (5th Cir.1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 729, 62 L.Ed.2d 728 (1980)).

Indeed, in this case the fact of possible prejudice because of the time pressures of overlapping juries was revealed at trial. At that time, the court instructed the jury of its responsibility to the present case. But evidently, Wylie did not make a motion for a new trial. As a result of her inaction, she is barred by both *Bolinger* and *Jones* from filing such a motion after the verdict has been rendered. *See United States v. Edwards*, 696 F.2d 1277, 1282 (11th Cir. 1983), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1984).

Even if, *arguendo*, Wylie had not waived this issue, she would be unable to prove that the alleged time pressures on certain jurors constituted "a significant risk of prejudice." *United States v. Patterson*, 648 F.2d 625, 629 (9th Cir.1981). The sixth amendment guarantees defendants the right to trial by an impartial jury. *Bolinger*, 837 F.2d at 438. An impartial jury "is capable and willing to decide the case solely on the evidence before it." *See, e.g., Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982); *Bolinger*, 837 F.2d at 438.

Moreover, "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences." *United States v. Sawyers*, 423 F.2d 1335, 1342 (4th Cir.1970). Such concerns form the basis for sequestration rulings, confidentiality rulings regarding jurors' names and addresses, *see United States v. Coonan*, 671 F.Supp. 959, 960 (S.D.N.Y.1987), and rulings regarding pretrial publicity, *see United States v. Gerald*, 624 F.2d 1291, 1295–96 (5th Cir.), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1980).

The trial court must start with the presumption that the jury is impartial. *United States v. Sedigh*, 658 F.2d 1010, 1014 (5th Cir. Unit A Oct. 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982). When it is presented with a "colorable claim" of outside influence on a jury, the court needs to determine initially whether any extrinsic factual matter or pressure has been imposed. *Id.*

Here, the government has indicated that the facts of overlapping juries and their possible influence on jurors were brought up before the end of the trial, but the evidence does not indicate whether Wylie made a motion to correct the matter. The record shows, however, that the court instructed the jury to focus its attention upon the trial at hand. Thus, *Sedigh* suggests that when the allegations of jury bias remain speculative, "the trial court need not inquire further." *Id.; see also United States v. Howard*, 506 F.2d 865, 868–69 (5th Cir.1975).

Only one case, *Patterson*, has dealt specifically with the problems of overlapping juries in this context. It involved overlapping juries where individual jurors were impaneled twice against the same defendant to try a second charge. *Patterson* is useful, however, for its enunciation of a two-part test for defendants to prove prejudice in overlapping juries. 648 F.2d at 629. It requires reversal only if the defendant proves that (1) the specific circumstances suggest a significant risk of prejudice [4] and (2) examination or admonition of the jurors fails to negate that inference. *Id.*

The circumstances here do not suggest a significant risk of prejudice. Unlike the situation in *Patterson*, the two trials here do not appear to have been similar or to have involved the same defendants. Moreover, Wylie's jurors would not be able to pre-judge the guilt of the second defendant in the same manner in which the jurors in *Patterson* could use their knowledge of their first trial to prejudice their actions in the second.

Nevertheless, since the juries *actually* overlap in Wylie's case, whereas a one-day break existed between the *Patterson* trials, greater time pressures could come to bear upon Wylie's jurors than on those in *Patterson*. However, Wylie failed to prove beyond mere speculation that the one and one-half hour overlap between the two tri-

---

**4.** *But see United States v. Splain*, 545 F.2d 1131, 1133 (8th Cir.1976) (witness's isolated, "innocuous" reference to past bad acts unlikely to be prejudicial; when evidence of guilt is "overwhelming," conviction should be affirmed).

als convinced the jury to convict her. While the jury foreman was one of the only two jurors to encounter the overlap, there is no indication that he was biased against Wylie or that he convinced others to be prejudiced against her.

The court's admonishment of the jurors during the trial satisfies the second prong of the *Patterson* test. Since Wylie's complaints of jury bias did not rise beyond the level of speculation, the court properly held a low-level inquiry into the problem and warned the jurors to focus upon one case at a time. According to *Sedigh*, the court did not have to conduct a full jury investigation into the matter, as no true bias was demonstrated.

## VI.

Lastly, Wylie contends that the upward departure in her sentence was impermissible. We utilize a clearly-erroneous standard when reviewing findings of fact that underlie a sentence under the federal sentencing guidelines. *United States v. Velasquez–Mercado*, 872 F.2d 632, 635 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 187, 107 L.Ed.2d 142 (1989). We employ an abuse of discretion standard when examining the process used by the trial court in sentencing. *See Wasman v. United States*, 468 U.S. 559, 563, 104 S.Ct. 3217, 3220, 82 L.Ed.2d 424 (1984).

The guidelines authorize a departure from the recommended guideline range where a court finds "an aggravating or mitigating circumstance ... that was not adequately taken into consideration by the Sentencing Commission...." 18 U.S.C. § 3553(b); *Velasquez–Mercado*, 872 F.2d at 637. Departures from the sentencing guidelines will be approved if the reasons for departure and the amount of the departure are reasonable.

"Reasonableness" means that a sentencing judge must provide articulate reasons having a sound factual basis that would justify departure from the guidelines. *United States v. Miller*, 874 F.2d 466, 471 (7th Cir.1989). A two-pronged test to determine whether such reasons justify a departure are (1) whether the particular cir-cumstance was incorporated into the guidelines and (2) whether the circumstances are sufficient and of a magnitude to merit departure and have a factual basis. *United States v. Summers*, 893 F.2d 63, 66 (4th Cir.1990).

Wylie's presentence investigation report (PSI) suggested a sentencing range of 41–51 months' imprisonment. The court sentenced her to 63 months and imposed a fine of $250,000. The court stated in the sentencing memorandum that a cooperating co-defendant, Williamson, received 33 months and that Hamilton received 83 months.

The court justified the fine by noting irregular discrepancies of over $1,200,000 in cash and other assets held by Wylie over a period of approximately four years. The court further justified its decision to depart from the guidelines by twenty-five percent for numerous reasons, the most important being Wylie's allowing the use of drugs in front of children in her home, her being the chief financial supply for the purchase of cocaine, her coercion of others, and her concealment of her role as a drug trafficker.

Wylie's arguments that the district court lacked sufficient reasons to depart from the guidelines are without merit. For example, she contends that some of the stated grounds for departure are adequately addressed by the guidelines. But section 5K2.0 of the guidelines states,

[T]he court may depart from the guidelines, even though the reason for departure is taken into consideration in the guidelines (*e.g.,* as an adjustment or specific offense characteristic), if the court determines that, in light of unusual circumstances, the guidelines level attached to the factors is inadequate.

Indeed, Wylie's contention that her offense was a "garden variety offense" of possession to deliver cocaine verifies the sentencing court's statement that Wylie showed no remorse for her crime. Wylie also contends that a number of the court's reasons are devoid of logic or have no factual basis. Finally, she states that the

court relied upon factors not considered in the PSI and thus compel vacatur and remand of her sentence. Each of Wylie's assertions is without merit.

We conclude that the court's reasons for departure are justified. Those reasons are well-articulated and have not been included in Wylie's base sentence.

Finding no error, we AFFIRM.

POLITZ, Circuit Judge, specially concurring:

I concur in the affirmance of the conviction but am persuaded that Wylie's "surplusage" objection addressed in Part II of the opinion should be rejected because it was untimely advanced. The opinion's analysis of this issue rests largely on the conclusion that "it was Hamilton's, not the government's, responsibility to request [Wylie's] removal" from the indictment. At 973. The record offers scant support for this proposition for it reflects that Hamilton joined in the "surplusage" motion which the trial court reluctantly granted. Moreover, United States Attorneys routinely move to dismiss some or all of the charges against a defendant, and likewise move to strike portions of an indictment not essential to the offense charged. *United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985).

Hamilton noted his willingness to plead guilty but he was not prepared to implicate Wylie. The prosecutor considered the references to Wylie to be nonessential to the question of Hamilton's guilt of the offense charged. In that setting, Hamilton could have waived indictment and the prosecutor could have filed an information, omitting all references to Wylie, Fed.R.Crim.P. 7(b). After acceptance of Hamilton's guilty plea to the information, the indictment as to Hamilton could have been dismissed. The prosecutor's unwise haste to shortcut the process, which the trial court questioned, would have thus been avoided, the defendant's rights would have been safeguarded, a valid conviction would have been secured, and there would have been no jeopardy to any other prosecution.

Nonetheless, I concur in the affirmance because Wylie's objection to the indictment was filed untimely. Fed.R.Crim.P. 12(b) requires that defenses and objections "based on defects in the institution of the prosecution" or on "defects in the indictment or information" be timely presented. All such objections "must be raised prior to trial." Wylie's objection was not raised prior to trial and it does not fall into any category which may be urged during or after the trial. *United States v. Smith*, 890 F.2d 711 (5th Cir.1989). I would not now consider this untimely objection. Having so ruled, I would not have reached the problematic question about the effect or scope of the alteration of the indictment.