IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 99-20920
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellant,

VERSUS

STEVON TODD MCCARTER,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Texas, Houston Division.
No. H-99-CR-37-SS
_____
February 23, 2001

Before DAVIS, BARKSDALE, and WOOD, Jr.[*], Circuit Judges.

PER CURIAM:[**]

On July 14, 1999, McCarter was convicted by a jury of conspiracy to possess with

intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and with possession of

---

[*]Circuit Judge of the Seventh Circuit, sitting by designation.

[**]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

cocaine and aiding and abetting in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. McCarter filed a motion for judgment of acquittal, or, in the alternative, moved for a new trial. The district court dismissed McCarter's motion for judgment of acquittal, stating that when viewing the evidence in a light most favorable to the verdict, "the jury could have found beyond a reasonable doubt that McCarter knew kilo quantities of cocaine were in the cooler when he participated in the theft . . . ." However, the district court granted McCarter's motion for a new trial. The government appeals. McCarter concedes that jurisdiction exists under 18 U.S.C. § 3731[1] and 28 U.S.C. § 1291 and does not contest the timeliness of the government's appeal.[2]

When the district court grants a motion for new trial, we determine whether the district court's ruling was supported by the record, and review for an abuse of discretion. *United States v. Robertson*, 110 F.3d 1113, 1116-17 (5th Cir. 1997). However, although the district court's discretion is broad, there are limits. *Id.* at 1118. "The court may not reweigh the evidence and set aside the verdict simply because it feels some other result

---

[1]18 U.S.C. § 3731 provides in pertinent part:
In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment or order of a district court . . . granting a new trial after verdict or judgment . . . except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

[2]McCarter filed a cross-appeal reiterating the argument that the evidence was insufficient to convict and asserting that double jeopardy would bar a new trial. The government filed a motion to dismiss the cross-appeal for lack of jurisdiction due to the fact that the government's appeal was interlocutory and not from a final order. This court granted the motion and dismissed the cross-appeal. *See United States v. O'Keefe*, 128 F.3d 885, 890 (5th Cir. 1997) ("18 U.S.C. § 3731 [] governs interlocutory appeals by the government from orders granting new trial.").

would be more reasonable." *Id.* (citation omitted). "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* (citation omitted). In this case, the district court noted that the evidence concerning McCarter's knowledge of the drugs was all circumstantial and "preponderate[d] heavily against the verdict." The district court concluded that while "the evidence is legally sufficient, it would be a miscarriage of justice to let this verdict stand."

To establish a violation under 21 U.S.C. §§ 841[3] and 846,[4] the government was required to prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to possess with the intent to distribute cocaine, (2) the defendant's knowledge of the unlawful purpose of the agreement, (3) the defendant's intention to join in the agreement, and (4) the defendant's voluntary participation in the conspiracy. Court's Instructions to the Jury, p. 14 (R. at 301); *see Robertson*, 110 F.3d at 1118-19. McCarter concedes his involvement in the conspiracy but maintains he never knew drugs were being stolen along with the money.[5]

---

[3]21 U.S.C. § 841(a)(1) provides that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ."

[4]21 U.S.C. § 846 provides, "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those described for the offense, the commission of which was the object of the attempt or conspiracy."

[5]In his motion for a new trial, McCarter did not raise the issue of severance. Therefore, he has waived that argument. *See, c.f., United States v. Wylie*, 919 F.2d 969, 978 (5th Cir. 1990).

The government presented evidence that there was a conspiracy to steal drugs and money on January 7, 1999, which involved a Drug Enforcement Administration ("DEA") confidential informant ("CI") who was a drug courier and had previously been arrested for possession of over two kilograms of cocaine. The CI was to inform the DEA about drug trafficking deals. The CI met Edward Dewayne Russell ("Russell") (McCarter's co-defendant) when she was employed in the entertainment business. Both Russell and McCarter worked for Rap-a-Lot Records. Russell (frontman for the conspiracy) had been under investigation by the DEA for drug trafficking since July 1998.

In approximately October 1998, after seeing the CI speaking to some well-known drug traffickers, Russell told the CI that if she "ever wanted to make some real money, let me know." The CI understood Russell to mean that he had a scheme to steal money and/or drugs from the drug dealers. (There was cumulative evidence presented about Russell's requests on this topic.) In December 1998, the CI proceeded with the DEA plan to involve Russell in a theft. The CI told Russell two drug couriers she knew were coming to town and that she would assist Russell in robbing them. The planning between the CI and Russell continued, eventually evolving to robbing the dealers of both the money and the drugs they were to purchase. (Later conversations repeatedly confirmed the fact that it was to be a robbery of both money and drugs.) Russell informed the CI that he planned to bring Cedric Rodgers ("Rodgers") into the deal. Rodgers was a Houston police officer and McCarter's cousin.

On January 6, 1999 (one day before the robbery), the CI and Russell spoke on the

telephone twice and met in person to finalize the robbery plans. Russell discussed a possible scenario where one of Russell's associates would approach the targeted victims and talk to them in a Puerto Rican accent. Evidence was presented that McCarter and Rodgers had previously planned to steal $30,000 in drug money. In that plan, McCarter spoke to the victim using a Puerto Rican accent. The scheme collapsed when unsuspecting fellow officers stopped to assist Rodgers in his "arrest" of McCarter and defeated Rodgers plan to confiscate the money. Also on January 6, there were four phone calls from McCarter to Russell.

On the day of the robbery, one of the ten calls made by the CI to Russell was at 6:38 p.m., at which time she gave Russell the location of the motel and the room number where she and the supposed victims were waiting. At 7:06 p.m., Russell called McCarter. At 7:20 p.m., McCarter paged Rodgers, and shortly thereafter spoke with Russell on the phone. Russell then called the CI to tell her he was sending someone over to the motel to check out the area. He told the CI he was sending over "Cash" (McCarter's nickname), whom the CI knew. Russell told the CI that McCarter was the "engineer." McCarter concedes that it was understood he was "more of an engineer," and not someone without "experience." Russell asked the CI for all the location information and told her he would pass it on to McCarter. The CI testified that she understood it was McCarter who was to be in control of the robbery.

McCarter called Russell again and then paged Rodgers a second time at 7:32 p.m. At about 8:00 or 8:30 p.m., DEA agents arrived with the CI at the location and placed a

cooler with six kilograms of cocaine and $90,000 of serialized bills inside a motel room with the CI. Approximately twenty minutes later, the CI called Russell and told him everything was ready. At 9:22 p.m., Russell spoke with McCarter on the telephone. At 10:08 p.m., McCarter spoke with Russell, and at 10:10 p.m., Russell called the CI, at which time she told Russell that "her people" had purchased the cocaine. She also told him the "money and food" were in the motel room in an ice cooler. At 10:18 p.m., McCarter paged Rodgers again. At 10:37 p.m., one of the co-conspirators paged McCarter and at 10:45 p.m., McCarter spoke with the co-conspirator on the telephone. McCarter admits that the circumstantial evidence suggests that Russell contacted McCarter, who in turn enlisted two other co-conspirators who would actually commit the theft.

Russell spoke with the CI at 10:53 p.m. and asked if "the money was in the cooler, too." The CI testified that she understand him to be asking if the money was in the cooler in addition to the cocaine, and she told him "everything" was in the cooler. Russell told her they were about 30 seconds away. The DEA then observed a black Volvo and a maroon Camaro pull in front of an appliance store near the motel. The cars pulled next to each other for a short time, at which time they seemed to be having a conversation. The Volvo then drove to the motel with the Camaro following. Russell called the CI at 10:57 p.m. and she testified that Russell acknowledged someone was with him and she understood that Russell was talking to someone about what was to happen. The Volvo pulled into the motel parking lot at about 10:59 p.m. McCarter was driving with Russell

in the passenger seat. Two other co-conspirators, one of whom McCarter had spoken with earlier, were in the Camaro. The two co-conspirators in the Camaro ran to the motel room and took the cooler.

Given McCarter's close involvement in the conspiracy, his leadership role, and his frequent consultations with Russell on the planning and execution of the robbery, it is not unreasonable for the jury to conclude that McCarter was aware of all aspects of the conspiracy, and, more specifically, that there would be a double benefit of both money and drugs. It is not unreasonable to infer that as one of the planners, McCarter was aware that they had to allow for additional time in order for the fictitious drug purchasers to locate and purchase the drugs they supposedly had told the CI they wished to acquire. Testimony and recorded conversations confirm that Russell intended to arrive after the CI informed him that the drugs were also in the motel room. Even at such a late point in time as when Russell and McCarter were in the car together traveling to the motel to commit the robbery and Russell had conversations with the CI about "everything" being in the cooler, if they had not already concluded so, the jury could reasonably have inferred that McCarter was listening to the conversations and was aware that both money and drugs were to be taken.

In response to McCarter's motion for a new trial, the district court concluded that the evidence was legally sufficient to support the jury's conviction. The government is not required to offer only direct evidence. *See Robertson*, 110 F.3d at 1119. We trust that the jury carefully followed the instructions in weighing the evidence and arriving at

its verdict.[6] *See Opper v. United States*, 348 U.S. 84, 95 (1954) ("Our theory of trial relies upon the ability of the jury to follow instructions.").  Even though circumstantial, we conclude that there was sufficient evidence for a rational jury to find all of the elements of the crime beyond a reasonable doubt and cannot say that the jury's verdict was against the weight of the evidence, or constituted a miscarriage of justice.  *See id.* Therefore, we reverse the district court's order of a new trial and remand with instructions to reinstate the jury's verdict of guilty.

REVERSED AND REMANDED.

---

[6]McCarter was also charged with being a felon in possession of ammunition under 18 U.S.C. § 922(g).  The jury found him not guilty of that charge.